**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DONNA G. POWERS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-06-468 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court is Plaintiff Donna G. Powers' (" Powers") motion for summary

judgment and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration

("Commissioner"),[1] response to Powers' motion for summary judgment.  Powers appeals the

determination of an Administrative Law Judge ("ALJ") that she is not entitled to receive Title XVI

supplemental security income benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A).  Having

reviewed the pending motions, the submissions of the parties, the pleadings, the administrative

record, and the applicable law, it is this Court's opinion that Powers' Motion for Summary

Judgment (Docket Entry No. 17) should be granted, the ALJ's decision denying benefits be

reversed, and the case be remanded, pursuant to sentence four, to the Social Security Administration

("SSA") for further proceedings.

---

[1] Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should therefore be substituted for Jo Anne B. Barnhart (former Commissioner) and Linda S. McMahon (interim acting Commissioner) as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.    *Background*

On April 7, 2003, Powers filed an application for supplemental security income benefits, alleging that she had been disabled and unable to work since February 14, 2002.  (R. 58, 59-60, 68).  Powers claims that she suffers from major depression,[2] mood disorder NOS (not otherwise specified),[3] bipolar disorder,[4] hepatitis C,[5] and dyslexia.[6]  (R. 61, 83).  After being denied benefits initially and on reconsideration (R. 32-33, 42-45), Powers requested an administrative hearing before an ALJ.  (R. 46).

A hearing was held on July 21, 2005, in Houston, Texas, at which time the ALJ heard testimony from Powers and Byron Pettingill, a vocational expert (" VE").  (R. 263-292).  In a decision dated September 17, 2005, the ALJ denied Powers' application for benefits.  (R. 16-20).

---

[2]  " Major depressive disorder"denotes a mood disorder characterized by the occurrence of one or more major depressive episodes and the absence of any  history or  manic, mixed,  or hypomanic episodes.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 530 (29th ed. 2000).

[3]  " Mood disorders" generally refers to mental disorders whose essential feature is a disturbance of mood manifested as one or more episodes of mania, hypomania, depression, or some combination.  Functional mood disorders are subclassified as *bipolar disorders*, including bipolar I disorder, bipolar II disorder, and cyclothymic disorder; *depressive disorders*, including major depressive disorder and dysthymic disorder; *mood disorder due to a general medical condition*; and *substance-induced mood disorder*.  *See* DORLAND'S, *supra*, at 530.

[4]  " Bipolar disorder" refers to mood disorders characterized by a history of manic, mixed, or hypomanic episodes, usually with concurrent or previous history of one or more major depressive episodes, including Bipolar I disorder, Bipolar II disorder, and Cyclothymic disorder.  *See* DORLAND'S, *supra*, at 528.

[5]  "Hepatitis" refers to an inflammation of the liver.  *See* DORLAND'S, *supra*, at 807.  "Hepatitis C" refers to a viral disease caused by the hepatitis C virus, the most common form of post transfusion hepatitis; it also follows parenteral drug abuse and is a common acute sporadic hepatitis, with approximately 50 per cent of acutely infected persons developing chronic hepatitis.  *See id*. at 808.

[6]  " Dyslexia" denotes an inability to read, spell, and write words, despite the ability to see and recognize letters; a familial disorder with autosomal dominant inheritance that occurs more frequently in males.  *See* DORLAND'S, *supra*, at 555.

On October 17, 2005, Powers appealed the decision to the Appeals Council of the SSA's Office

of Hearings and Appeals (R. 9-12), which, on December 9, 2005, declined to review the ALJ's

determination.  This rendered the ALJ's opinion the final decision of the Commissioner.  *See*

*Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Powers filed her original complaint in this case on

February 13, 2006, seeking judicial review of the Commissioner's denial of her claims for

benefits.  *See* Docket Entry No. 1.

**II.**    *Analysis*

    **A.**    *Statutory Bases for Benefits*

    SSI benefits are authorized by Title XVI of the Act and are funded by general tax

revenues.  *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th

ed. 2001).  The SSI Program is a general public assistance measure providing an additional

resource to the aged, blind, and disabled to assure that their income does not fall below the

poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of indigence and

disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI

program cannot receive payment for any period of disability predating the month in which she

applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192

F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation

provides:

> When you file an application in the month that you meet all the other requirements
> for eligibility, the earliest month for which we can pay you benefits is the month
> following the month you filed the application.  If you file an application after the
> month you first meet all the other requirements for eligibility, we cannot pay you
> for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335.  Thus, the month following an application, here, May 2003, fixes the earliest date from which benefits can be paid.  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

Applicants seeking benefits must prove "disability" within the meaning of the Act, which defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).

**B.**    ***Standard of Review***

**1.**    ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See*

4

*Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass' n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.   *Administrative Determination*

Judicial review of the Commissioner' s denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  " Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner' s decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court " scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner' s findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*,

or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

**C.    *ALJ's Determination***

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 416.920(d).

4.    If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 416.920(e).

5.    If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705. The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his or her existing impairments, the burden

shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). " Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 416.972. A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). " [A]n individual is 'under a disability, only if [her] impairments are of such severity that he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy . . . .' " *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.     The claimant filed an application for supplemental security income on April 7, 2003.

2.     No evidence of substantial gainful activity exists during the relevant period under consideration.

3.     The claimant has " severe" medically determinable impairments of major depression and a substance abuse disorder (in remission).[7]

4.     None of the claimant' s impairments, either singly or in combination, is attended by clinical or laboratory findings which meet or medically equal the criteria for [sic] set forth in Appendix 1 to Subpart P of Regulations No. 4 (" Listing of Impairments") for presumptive disability, the listed severity criteria being absent.

5.     The claimant' s testimony regarding subjective complaints and functional limitations is not fully credible.

6.     The claimant does not have any exertional limitations.  Her residual functional capacity is compromised by the inability to perform more than simple and repetitive tasks and inability to have more than incidental contact with the public.

7.     The claimant is capable of performing her past relevant work and an industrial cleaner and office cleaner.

---

[7] " Substance abuse disorder" refers to a group of mental disorders in which maladaptive behavioral and biologic changes are associated with regular use of alcohol, drugs, and related substances that affect the central nervous system and result in failure to meet significant obligations in personal and social functioning. *See* STEDMAN' S MEDICAL DICTIONARY 528 (27th ed. 2000).

8.      The claimant has not been under a disability, as defined in the Act, at any
        time through the date of this decision.

(R. 19-20).  Because the ALJ determined that Powers could perform her past relevant work, he

did not reach step five in the sequential evaluation process.

This court's inquiry is limited to a determination of whether there is substantial evidence

in the record to support the ALJ's findings and whether the proper legal standards have been

applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619;

*Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3).

To determine whether the decision to deny Powers' claim for disability benefits is supported by

substantial evidence, the court weighs the following four factors:  (1) the objective medical facts;

(2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's

subjective evidence of pain and disability, and any corroboration by family and neighbors; and

(4) the plaintiff's age, educational background, and work history.  *See Martinez v. Chater*, 64

F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing

*DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to

be resolved by the ALJ, and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at

496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.**     ***Issues Presented***

Powers contends that the decision of the ALJ is not supported by substantial evidence.

Specifically, Powers claims that the ALJ erred by: (1) improperly rejecting and/or according little

weight to the findings and opinions of her treating physician without considering the factors set

forth in 20 C.F.R. § 416.927; (3) failing to explain what weight, if any, he gave to the state

9

agency's reviewing physician's opinion; and (4) failing to consider medication side effects as required by 20 C.F.R. § 416.929(c). *See* Docket Entry No. 17. The Commissioner disagrees with Powers' contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 19.

### E.   *Review of the ALJ's Decision*

#### 1.   *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).  The applicable regulations further provide:

> (1)(I)  If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> > (A)  You do not exhibit one or more of the medical findings specified in the particular listing, or
> >
> > (B)  You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

     (ii)     We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a). Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

     A review of the medical records submitted in connection with Powers' administrative hearing reveals that Powers has an eighth grade education; she dropped out of school in 1979 when she became pregnant. (R. 104). While in school, Powers reportedly was enrolled in special education classes and developed only a third grade reading level due to dyslexia. (R. 104). Around this time period, Powers began using nicotine, namely, smoking cigarettes. (R. 104). Powers did not obtain a GED. (R. 104).

     In 1984, at age 21, Powers was admitted as a psychiatric patient at Baytown Medical Center Hospital. (R. 92). She had been experiencing gradually increasing depressive symptoms, including mid and terminal sleep disorder, weight loss, intractable weeping and crying, loss of interest in all activities and, at times, assuming a fetal position and becoming confused. (R. 92). T. Krell, M.D. ("Dr. Krell") noted that her mood was one of severe despondency, with very poor judgment and insight. (R. 92). Dr. Krell's impression was that Powers had psychotic depression. (R. 92).

From March 1997 to July 1997, Powers received counseling for recurrent major depression at the Denton County MHMR Center.  (R. 89-90).  Powers was assigned a Global Assessment of

Functioning ("GAF") score of 50.[8]  (R. 89).  The reason noted for Powers' discharge from MHMR was that Powers had moved from the service area and had failed to leave a forwarding address.  (R. 89).

It was reported that Powers had a history of illicit drug use, intravenously, namely, cocaine.  (R. 95, 100, 103).  Powers allegedly used cocaine daily for two years.  (R. 104).  In either 1999 or 2000, Powers tested positive for Hepatitis C.  (R. 100, 103).  Powers reportedly stopped using cocaine in 2001.  (R. 104, 209).

On May 27, 2003, Powers was admitted to Houston Northwest Medical Center due to an abscess on her right ring finger.  (R. 98-100).  At that time, Powers was not taking any regular medications.  (R. 100).  Powers had an infectious disease consultation with Luis Castillo, M.D. ("Dr. Castillo").  (R. 101).  Cultures revealed that Powers had methicillin-resistant staphylococcus aureus ("MRSA") and beta-hemolytic strep B.  (R. 95, 96, 101).  Powers was placed on an intravenous antibiotic.  (R. 96, 101).  Steven W. Schierman, M.D. ("Dr. Schierman") operated on Powers' finger, draining and irrigating the abscessed area.  (R. 97).

---

8  A GAF score represents a clinician's judgment of an individual's overall level of functioning.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 32 (4th ed. 2000).  The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning—*e.g.*, 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms.  A GAF rating of 50 indicates a "serious" impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  *See id* at 34.

Powers was discharged on June 3, 2003, with a diagnosis of cellucitis or her right ring finger. (R. 95). Dr. Schierman noted that Powers would have a full thickness skin graft as an outpatient. (R. 95). On June 17, 2003, Dr. Schierman performed the skin graft surgery on Powers' finger. (R. 214-228).

On July 9, 2003, Powers met with A. Rashad Cheema, M.D. (" Dr. Cheema") for a physical evaluation for the Disability Determination Services (" DDS"). (R. 110-112). Dr. Cheema noted that Powers complained of Hepatitis C for the last three years; liver problems by liver biopsy three years prior; dyslexia; abdominal and back pain; and psychiatric problems and depression. (R. 110). A physical examination revealed normal findings in all areas. (R. 110-111). Dr. Cheema did not observe any specific disabling properties. (R. 111). He reported that " [h]er symptoms of disability seem to exceed her physical findings." (R. 111). Dr. Cheema further reported that it was his impression that Powers had " quite a bit of psychiatric problems, which seems to be the root of these complaints." (R. 111).

The next day, on July 10, 2003, Powers met with Kathy Scott-Gurnell, M.D. (" Dr. Scott-Gurnell") for a consultative examination. (R. 102-108). Dr. Scott-Gurnell noted that Powers was applying for disability because of " Hepatitis C." (R. 102). At that time she was not taking any medications. (R. 103). Powers complained of poor concentration, low energy, isolation and depression as reasons she could not work. (R. 107). Powers' mood and affect was observed to be dysphoric with a blunted affect. (R. 105). She was oriented to person, place and circumstance, but did not know the date. (R. 105). Her thought content was devoid or suicidal or homicidal ideations or plans; she reported, however, auditory hallucinations, " scary and daddy' s voice." (R. 105). Powers' immediate, recent and remote memory were noted to be

intact.  (R. 105).  Dr. Scott-Gurnell found that Powers'  concentration was impaired.  (R. 105-

106).  Her pace was noted to be slow with fair persistence.  (R. 106).  Dr. Scott-Gurnell noted

that Powers had given up her parental rights, which indicated decompensation.  (R. 103, 107).

Based on her evaluation, Dr. Scott-Gurnell diagnosed Powers as follows:

> mood disorder, NOS as per insomnia, morbid dreams, weight gain, decreased
> energy, poor concentration, isolation and irritability.  Depression, crying,
> hopelessness, helplessness, morbid wishes and episodes of excessive energy for
> three to four days every three to four months without cocaine use.  She usually
> cleans, draws, and writes excessively.  She is euphoric and plays and dances with
> her children.  She is talkative and invites friends over to talk all night.  She also
> has shopping sprees  (possible Bipolar Disorder but documentation of manic
> episode needed.
>
> History of Cocaine Dependency, sober two years

(R. 107).  Dr. Scott-Gurnell assigned Powers a GAF score of 40.[9]  (R. 107).  Dr. Scott-Gurnell's

prognosis of Powers was " fair."  (R. 107).

On August 1, 2003, had a consultative examination with Leela C. Reddy, M.D. (" Dr.

Reddy"), a physician with the state disability services–a component to the SSA's evaluation for

benefits.  (R. 118-131).  Dr. Reddy completed a Psychiatric Review Technique form, concluding

that Powers did not meet Listing 12.04.  Dr. Reddy found that Powers had moderate limitations

in maintaining social functioning as well as maintaining concentration, persistence, or pace; mild

restriction of activities of daily living; and no episodes of decompensation.  (R. 128).  Dr. Reddy

noted that Powers lived with her sister, Nikki Hastings (" Hastings") and that Hastings had

---

[9]  A GAF rating of 40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See* DSM-IV-TR*, supra*, at 34.

custody of Powers' two children.  (R. 130).  Dr. Reddy further noted, however, that Powers cares for her own personal hygiene, does chores when physically " up to it," has friends, goes out to dinner, but preferred to be alone.  (R. 130).  Dr. Reddy determined that the evidence did not establish the presence of the " C" criteria of Listing 12.04.[10]

Dr. Reddy also completed a Mental Residual Functional Capacity form, concluding Powers was markedly limited in her ability to understand and remember detailed instructions as well as her ability to carry out detailed instructions.  (R. 114-116).  Dr. Reddy further found that Powers was moderately limited in her abilities in the following areas:   to maintain attention and concentration for extended periods; perform activities within a schedule maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in

---

[10] Listing 12.04(C) provides as follows:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support,  and one of the following:

1.    Repeated episodes of decompensation, each of extended duration; or
2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04.

the work setting; and to set realistic goals or make plans independently of others.  (R. 114-115).

She found that Powers retained the residual mental capacity to perform " simple tasks,  get along

with coworkers & supervisor, and adapt to routine changes in the workplace.  Symptoms are not

wholly credible w[ith] medical evidence."  (R. 116).

Finally,  on August 1, 2003, S.W. Casner, M.D. (" Dr.  Casner")  reviewed Powers'

physical  health  records  for  the  state  disability  services  and  determined  she  had  non-severe

impairments.  (R. 113).

After being threatened by family members to commitment to a psychiatric ward, Powers

began treatment on November 10, 2003, with the Harris County MHMR.  (R. 212, 260, 272).

Powers met with Kenneth Winaker, M.D. (" Dr. Winaker") for her initial assessment.  (R. 208-

212).  Powers reported symptoms of panic attacks, insomnia, anxiety, depressed mood, crying

spells, psychosocial stressors, hopelessness, helplessness, previous suicide attempts, no current

suicidal ideations, history of physical and sexual abuse, and mania.  (R. 212).  Dr. Winaker' s

impression was that Powers suffered from major depressive disorder with psychosis and bipolar

disorder.  (R. 212).  Dr. Winaker assigned Powers a GAF score of 45.[11]  (R. 212).  Dr. Winaker

recommended that Powers begin treatment with MHMR, including case management appointments

per week as well as pharmacological management.  Luis Suarez, M.D. (" Dr. Suarez) met with

Powers and prescribed medication (Paxil) for her depression.  (R. 204-205, 208).  At that time,

Dr. Suarez reported Powers'  symptom severity to rate a 6 on a scale of 0 to 10.  (R. 204).

---

[11]  A GAF rating of 45 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  *See* DSM-IV-TR, *supra*, at 34.

On or about December 12, 2003, Power returned to MHMR and met with Robin Dossman, M.D. (" Dr. Dossman").  (R. 202-203).  Dr. Dossman noted insufficient improvement and assessed Powers' symptom severity as a 7 on a scale of 0 to 10.  (R. 202).  Dr. Dossman modified Powers' medication to decrease the Paxil and begin a trial of Wellbutrin for her depression.  (R. 202A-203).

On January 16, 2004, Powers returned for a follow-up appointment at MHMR and met with  [illegible first name] Nalleemudon, M.D. (" Dr. Nalleemudon").  (R. 199-201).  Dr. Nalleemudon noted minimal response to her medication and rated Powers' symptom severity as a 6 on a scale of 1 to 10.  (R. 199). He continued her medication (Wellbutrin) and recommended that she return to see Dr. Dossman in a month.  (R. 200-201).  During this visit, MHMR assessed Powers' continued need for services, noted limited progress, and recommended that she continue treatment.  (R. 182-184).

On February 20, 2004, Powers returned to MHMR for an appointment with Dr. Dossman.  (R. 196-198).  Powers' sister, Hastings, and Powers' son also attended the appointment.  (R. 197).  Powers reported feeling more irritable, unable to sleep for days at a time.  (R. 197).  Hastings reported that Powers looks as if she was on drugs.  (R. 197).  Powers reportedly did not do anything except sleep on the sofa.  (R. 197).  Dr. Dossman continued Powers on Wellbutrin and added medication (Topamax) for Powers' bipolar disorder.  (R. 198).

On April 2, 2004, Powers returned to see Dr. Dossman for a follow-up examination.  (R. 193-195).  At that time, Powers reported doing well on her medications with no adverse side effects.  (R. 194).  Dr. Dossman rated her GAF at 45 and continued her medications.  (R. 194-195).  Dr. Dossman recommended a follow-up visit in 10 weeks.  (R. 194).  During this visit,

18

MHMR assessed Powers' continued need for services, noted limited progress, and recommended that she continue treatment. (R. 179-181).

Due to persistent abdominal pain, chronic diarrhea, and nausea, on May 19, 2004, Powers underwent two surgical procedures–an esophagogastroduodenoscopy and a colonoscopy. (R. 230-233). From the gastroscopy, Hari Pokala's, M.D. ("Dr. Pokala") impression was that pathology results from small bowel biopsies needed to be reviewed to rule out Giardia. (R. 231). Dr. Pokala also reported that Powers had minimal gastritis and a sliding hiatal hernia. (R. 231). Based on the colonoscopy, Dr. Pokala's impression was pathology results from polyps removed from the rectum needed to be reviewed. (R. 233). Additionally, Dr. Pokala noted that Powers had a "very, very long tortuous spastic colon," diverticula, colonic and rectal polyps, and hemorrhoids. (R. 233). Dr. Pokala subsequently noted that pathology results suggested that Powers suffered from inflammatory bowel disease. (R. 236).

On June 30, 2004, Powers returned to visit Dr. Dossman. (R. 191-192). Although the second page of progress notes is not in the administrative record and the medication page is illegible, it appears that Powers' medication was only partially responsive at that time. (R. 191-192). During this visit, MHMR assessed Powers' continued need for services, noted limited progress, and recommended that she continue treatment. (R. 176-178). In the plan of care oversight notes, Powers' symptoms were described as "unstable mood with sad, depressed mood, irritability, low energy, difficulty concentration, also with paranoia." (R. 176).

On September 15, 2004, Powers met with Dr. Dossman for a follow-up visit. (R. 189-190). The second page of the progress notes is not in the administrative record and the medication page is illegible. (R. 189-190). During this visit, MHMR assessed Powers' continued need for

19

services, noted limited progress, and recommended that she continue treatment.  (R. 173-175).
In the plan of care oversight notes, Powers' symptoms again were described as " unstable mood
with sad, depressed mood, irritability, low energy, difficulty concentration, also with paranoia."
(R. 173).

On October 27, 2004, Powers met with Dr. Dossman.  (R. 169-172).  At that time, it was
noted that she was having full medication response.  (R. 170).  Powers reported that she was
doing well and not having adverse side effects to her medications.  (R. 170).  She reported having
a new boyfriend, engaging in activities, and an increased appetite.  (R. 170).  Dr. Dossman rated
her GAF at 55.[12]  (R. 171).  Dr. Dossman added Concerta to Powers' medications.  (R. 188).

On December 1, 2004, Powers met with Dr. Dossman for a follow-up appointment.  (R.
164-168).  Dr. Dossman noted Powers' symptoms as worsening and only a partial response to
medication.  (R. 165).  Powers reported feeling sad, with occasional sleep difficulties.  (R. 165).
Dr. Dossman reported Powers' GAF at 55.  (R. 156, 166).  During this visit, MHMR assessed
Powers' continued need for services and recommended that she continue treatment.  (R. 156-
163).

On January 12, 2005, Powers met with Dr. Dossman.  (R. 154-155, 185-187).  Dr.
Dossman noted insufficient improvement in Powers' condition and rated her symptom severity
as a 6 on a scale of 0 to 10 and side effects were rated as a 4 on a scale of 0 to 10.  (R. 186).
Powers reported that she " got messed up on that medicine."  Powers claimed to be increasingly

---

[12] A GAF rating of 55 indicates a "moderate" impairment in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or coworkers).  *See* DSM-IV-TR, *supra*, at 34.

tired and unable to sleep well at night.  (R. 187).  Dr. Dossman noted that Powers had increased stress, poor coping skills, and an unhealthy lifestyle.  (R.  187).  Dr. Dossman noted that she educated Powers regarding a healthy lifestyle and boundaries; re-educated Powers regarding her medication; increased Powers' prescription for Wellbutrin. (R. 185, 187).  At that time, Dr. Dossman assessed Powers' GAF at 47.[13]  (R. 187).

 On February 23, 2005, Powers met with Dr. Dossman.  (R. 149-153).  Dr. Dossman noted Powers as having a full response to medication but her symptoms were worsening.  (R. 150).  Dr. Dossman rated Powers' symptom severity as a 5 on a scale of 0 to 10.  (R. 150). Powers reported feeling tired all of the time, but unable to sleep.  (R. 150).  Powers reported some depression regarding her inability to be with her children.  (R. 150).  Dr. Dossman assessed Powers' GAF at 55.  (R. 151).  Dr. Dossman prescribed medication (Ambien) to help Powers sleep.  (R. 153).

Powers missed her appointment in March 2005, but met with Dr. Dossman on April 12, 2005. (R. 146-148).  Although the treatment notes are not in the administrative record, the review of the case management plan indicates that Powers reported mild depressive symptoms, low energy levels, good appetite, and good sleep patterns.  (R. 133-135, 147).

On June 23, 2005, Dr. Dossman completed a psychiatric disability statement, concluding that Powers suffered from affective disorders that met the requirements of Listing 12.04.  (R. 252-260). Dr. Dossman reported that Powers suffered from four or more episodes of decompensation,

---

[13]  A GAF rating of 47 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  *See* DSM-IV-TR, *supra*, at 34.

each of extended duration; Powers had extreme difficulties in maintaining concentration, persistence, or pace; Powers had marked difficulties in maintaining social functioning; and Powers had moderate restriction of activities of daily living.  (R. 255-256).  Under the " C" criteria of 12.04, Dr. Dossman found that Powers suffered from: (1)  repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; and (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.  (R. 256).

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant' s injuries, treatments, and responses should be accorded considerable weight in determining disability."  *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician' s opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza,* 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician' s opinion in favor of other experts when the treating physician' s evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton* 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).  It is well

settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the present case, the ALJ improperly rejected and/or accorded little weight to the findings and opinions of Powers' treating psychiatrist, Dr. Dossman, without considering the factors set forth in 20 C.F.R. § 416.927. (R.18). The Fifth Circuit has made clear that even if a treating physician's report is not entitled to controlling weight, the ALJ must still evaluate it under the factors applicable to the consideration of all medical evidence. *See Newton*, 209 F.3d at 456. Specifically, in *Newton*, the court held:

> absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 1527(d)(2). Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

*Id.* at 453 (emphasis in original); *accord Barrientoz v. Massanari*, 202 F. Supp. 2d 577, 591 (W.D. Tex. 2002). Here, the ALJ scarcely mentioned Dr. Dossman's assessment, much less evaluate it under the § 416.927 factors.

> The claimant's treating psychiatrist, Robin Dossman, M.D., assessed that the claimant has a "moderate" degree of limitations in restriction of activities of daily living; "marked" limitation in difficulties in maintaining social functioning; "extreme" limitation in difficulties in maintaining concentration, persistence, or pace; and four or more repeated episodes of decompensation resulting from an affective disorder. (Exhibit 13F). Dr. Dossman's assessment is neither credible nor consistent with the objective medical evidence of record or with the claimant's

reported activities.    Therefore,  it  is  not  given  significant  weight  in  the determination  of  whether  or  not  the  claimant  is  disabled  for  social  security purposes.

(R.  18).   Without  explanation,  the  ALJ  appears  to  have  adopted  findings  from  the  one  time

consultative  examination  by  state  examiner  Dr.  Reddy;  the  ALJ  lifted  language  directly  from  Dr.

Reddy's  assessment  form  and  placed  it  in  his  conclusions.  (R.  17,  128-129).  As  set  forth  above,

the  record  is  replete  with  Dr.  Dossman's  treatment  and  progress  notes  related  to  Powers'

psychological  disorders,  dating  back  to  2003.  (R.  133-206).

Moreover,  the  ALJ's  decision  contains  multiple  examples  of  incomplete  or  inconsistent

readings  of  the  evidence  in  the  record,  reflecting  a  tendency  to  pick  and  choose  the  evidence  that

supported  his  denial  of  benefits.    For  example,  the  ALJ  found  that  Powers  "had  a  successful

treatment  for  major  depression  from  the  Denton  County  Mental  Health  Mental  Retardation

Center;"  however,  the  record  does  not  support  this  finding.   The  record  merely  contains  a  two-

page  discharge  report,  containing  a  few  hand-written  notes,  addressing  primarily  the  dates  of

Powers'  appointments  and  stating  that  treatment  was  discontinued  because  Powers  had  moved

from  the  service  area  without  leaving  a  forwarding  address.   (R.  89).   The  only  evaluative

statement  in  the  report  is  that  Powers  appeared  to  respond  well  to  the  antidepressant  medications"

and  "showed  marked  improvement  in  her  symptoms  as  per  the  doctor's  notes."  (R.  90).

In  another  instance,  the  ALJ  mischaracterizes  information  in  Powers'  2003  Mental  Status

Examination  report.   In  the  ALJ's  decision,  he  states  that  according  to  that  report  Powers  had

"no  suicidal  or  homicidal  ideations."  (R.  17).   The  2003  report,  however,  states  that  Powers

"acknowledges  suicidal  ideations  in  the  past  but  denies  attempts  since  her  younger  children  were

born."  (R.  103).   Additionally,  in  referencing  this  report,  the  ALJ  found  that  Powers  had  "minor

impairment in concentration but memory and judgment were intact." (R. 17).  The report does not define Powers' concentration limitations as "minor."  Indeed, the examiner specifically describes Powers' concentration as "poor" and "impaired."  (R. 105-106, 107).

Similarly, the ALJ appears to misinterpret the 2003 Mental Status report as it relates to Powers' activities.  The ALJ cites the report for the proposition that Powers "reported activities of cleaning, drawing, writing, dancing and playing with children, shopping and socializing with friends." (R. 17).  The ALJ fails to state, however, that Powers describes doing such activities during "episodes of excessive energy" that last "for three to four days every three to four months." (R. 103, 107).  The report indicates that Powers' sister (Hastings) stated that Powers cannot consistently keep the house clean and could not care for younger children.  (R. 103, 106).  In this regard, in his report Dr. Scott-Gurnell noted that Powers had given up her parental rights, which indicated decompensation. (R. 103, 107).  Powers' GAF score was rated 40.  (R. 107).  Neither the ALJ nor Dr. Reddy appear to consider Powers' GAF score or documented decompensation.

In sum, the ALJ's summary disregard or the evidence as a whole as well as Dr. Dossman's assessment was improper and is not supported by substantial evidence.  Consequently, this case must be remanded for a proper evaluation of the evidence and a review of Dr. Dossman's assessment utilizing the guidelines set forth in 20 C.F.R. § 416.927.  It may be of benefit to the ALJ to have a medical expert, specializing in psychiatry, present at any new administrative hearing to properly review and evaluate the medical evidence.

2.    ***Subjective Complaints***

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco*, 27 F.3d at 163 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally, the mere existence of pain does not automatically bring a finding of disability.

*Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.   It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.   *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be " constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.   The decision arising from the ALJ' s discretion to determine whether pain is disabling is entitled to considerable deference.   *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.   However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.   *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

In his decision, the ALJ stated:

> I weighed the credibility and consistency of the claimant' s allegations with clinical and laboratory findings, as well as with other extrinsic factors and statements, and the entire record.   I find that the testimony of the claimant is not fully credible. There is no objective corroboration for many of her symptoms.   As noted, those symptoms are not sufficient to support total disability.

(R. 18).   The ALJ further stated:

> While no one factor was determinative, the following factors in combination were indicative of a finding that the claimant' s subjective complaints were not corroborated in severity, duration, and intensity as to support a finding of " total disability" as she alleges:
>
> 1.  The claimant' s reported activities are not shown to be consistent with her claim of total disability.   She is often away from home visiting friends and she has not required treatment at a psychiatric hospital.   The claimant was employed years ago with essentially the same limitations as she now alleges to be " disabling."

2.      If an impairment can be reasonably controlled by medication or treatment, it cannot serve as a basis for a finding of disability. (20 C.F.R. § 416.930).  The claimant's condition has responded to treatment and substance abuse cessation.

3.      The claimant is not receiving or seeking frequent medical treatment, which tends to undermine her allegation of incapacitating symptoms.

4.      The objective medical evidence is not consistent with total disability.  The claimant had a "dependency" problem (Exhibit 2F) and abused cocaine daily for 2 years (Exhibit 3F).  Nevertheless, her substance addiction disorder is currently in remission and this further improves her overall condition.

(R. 18-19).

The ALJ's findings are not supported by the record.  As an initial matter, to the extent the ALJ contends that Powers was able to maintain employment "years ago with essentially the same limitations she now alleges to be 'disabling,'" this assertion is flawed.   The ALJ is not qualified to make medical assessments regarding Powers' mental health and whether Powers' current mental health is the same as it was "years ago" when she was able to work.  The ALJ also misinterprets Powers' reported "activities."  The record describes Powers as being "socially withdrawn" and suffering from "unstable living conditions," "family difficulties," "learning difficulties," "limited education," and "memory impairment." (R. 173, 177, 180, 183).  The testimony and evidence demonstrate that Powers has an inability to consistently tend to chores or her children.  (R. 103, 106, 107, 277-278).  Additionally, Powers testified at the administrative hearing that arrangements had been made for Powers to go with a friend to her job at a funeral home every day so that Powers was not left alone.  (R. 274).

As for the ALJ's determination that Powers was not seeking frequent medical treatment and that her impairments were controlled by medication, these contentions are not supported by substantial evidence. As set forth above, the record is replete with Dr. Dossman's treatment and progress notes related to Powers' psychological disorders, dating back to 2003. (R. 133-206). During the relevant time period, Powers' GAF rating fluctuated between 40-55. (R. 107, 151, 156, 166, 171, 187, 194, 212). The severity of Powers' symptoms was unstable. In January 2004, Powers' mood was "stable" and her energy level "high." (R. 182). Between January 2004 and June 2004, Powers experienced a "decrease in manic and depressive symptoms." She demonstrated an unstable mood . . . low energy, difficulty concentrat[ing], also with paranoia." (R. 176). Between June and September 2004, Powers seemed to have her paranoia "under control" and that was an "improvement in energy level." (R. 173). Powers' mood, however, was still noted as unstable, the paranoia remained present and she continued to have low energy and difficulty concentrating. (R. 173). In January 2005, Powers was described as having "[d]epression, anxiety, assum[ing] guilt for many things" and she had "fragmented sleep." (R. 154). Additionally, Powers' medications were modified in December 2004 and again in February 2005 because her symptoms were reportedly "worsening." (R. 150, 165).

Finally, the ALJ's focus on Powers' substance addiction disorder and the ALJ's statement that "her substance addiction disorder is currently in remission and this further improves her overall condition" is misplaced. While Powers clearly had a substance abuse problem for a period of time (R. 95, 100, 103), Powers reportedly stopped taking using drugs in or around 2001. (R. 104, 209). In her April 7, 2003, application for benefits, Powers contends that she has been unable to work since February 14, 2002–both events are well after she reportedly

stopped using drugs.  Notwithstanding, the ALJ does not have the medical expertise to make assessments regarding improvement in Powers' " overall condition."

### 3.     *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  If a claimant demonstrates that she cannot perform her past relevant work, the Commissioner bears the burden of proving that her functional capacity, age, education, and work experience allow her to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  Once the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey*, 230 F.3d at 135.

To determine whether an applicant can return to a former job or, if never employed, can perform substantial work in the national economy, the regulations require the ALJ to evaluate the applicant's residual functional capacity (" RFC").  *See Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983) (citing 20 C.F.R. §§ 404.1561, 416.961).  This term of art merely designates the ability to work despite physical or mental impairments.  *See id.*; *see also* 20 C.F.R. §§ 404.1545, 416.945.  " Residual functional capacity" combines a medical assessment with the descriptions

by physicians, the applicant or others of any limitations on the applicant's ability to work. *See id.* When a claimant's RFC is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See* 20 C.F.R. §§ 404.1561, 416.961. The testimony of a vocational expert is valuable in this regard, as "[she] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Carey*, 230 F.3d at 145; *see also Masterson*, 309 F.3d at 273; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). In the absence of contrary evidence, the ALJ may properly rely on the testimony of a vocational expert in reaching a conclusion regarding a claimant's RFC to perform work available in the national economy. *See Masterson*, 309 F.3d at 273.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the regulations, also referred to as the grids, without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act. *See Heckler v. Campbell*, 461 U.S. 458, 467, 470 (1983). As the Supreme Court explained in *Campbell*:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress–physical ability, age, education, and work experience–and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

461 U.S. at 461-62 (footnotes omitted). The Court elaborated:

Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs—*i.e.*, whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 404.1567. Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects [she] must lift and whether extensive movement or use of arm and leg controls is required. *Ibid*.

*Id.* at 462 n.3.

Under the regulations, impairments can be either exertional or nonexertional. *See Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs. *Id.* The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *See id.*; *see also* 20 C.F.R. § 404.1569(a). All other impairments are classified as nonexertional. *See Sykes*, 228 F.3d at 263.

In evaluating RFC, the Fifth Circuit has looked to SSA rulings ("SSR"). The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See Myers*, 238 F.3d at 620 (citing *B.B. ex rel. A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981)). In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and the interplay of exertional and nonexertional factors:

First, SSR 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent

> work schedule." " The RFC assessment is a function-by-function assessment based
> upon all of the relevant evidence of an individual' s ability to do work-related
> activities." " However, without the initial function-by-function assessment of the
> individual' s physical and mental capacities, it may not be possible to determine
> whether the individual is able to do past relevant work. . . ."  RFC involves both
> exertional and nonexertional factors.  Exertional capacity involves seven strength
> demands:   sitting, standing, walking, lifting, carrying, pushing, and pulling.
> " Each function must be considered separately."   " In assessing RFC, the
> adjudicator must discuss the individual' s ability to perform sustained work
> activities in an ordinary work setting on a regular and continuing basis. . . ."  The
> RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (quoting 61 Fed. Reg. 34474-01 (July 2, 1996)).  The court also noted that SSR 96-9p defines exertional capacity as the aforementioned seven strength demands and requires that the individual' s capacity to do them on a regular continuing basis be stated.  *See id.*  Thus, to determine that an applicant can do a given type of work, the ALJ must find that the applicant can meet the job' s exertional and nonexertional requirements on a sustained basis and can maintain regular employment.  *See Watson*, 288 F.3d at 218; *Singletary v. Bowen*, 798 F.2d 818, 821 (5th Cir. 1986); *Carter*, 712 F.2d at 142 (citing *Dubose v. Mathews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ' s findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform.  *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)).  Nevertheless, " use of the grid rules is only appropriate ' when it is established that the claimant suffers only from exertional impairments, or that the claimant' s nonexertional impairments do not significantly affect [her] residual functional capacity.' "  *Watson*, 288 F.3d at 216 (quoting

33

*Crowley*, 197 F.3d at 199); *accord Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458.   If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy.   *See id.*   Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC.   *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

Here, Powers suffers from nonexertional impairments (*i.e.*, mental impairments); thus, it was proper for the ALJ to rely on a vocational expert to establish that suitable jobs exist in the economy. *See Watson*, 288 F.3d at 216 (quoting *Crowley*, 197 F.3d at 199); *accord Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458.

In the case at bar, the ALJ failed to formulate hypothetical questions for the VE that encompassed all of Powers' recognized limitations.   The ALJ posed the following questions to the VE:

> Q:      Now Mr. Pettingill, what I need you to consider is a hypothetical individual who has the claimant's young age and limited education under the Social Security standard.   That's about an eighth grade accomplishment.   Now that person may have some difficulty with reading and writing, but they have also been self-employed, filed income tax and obtained and maintained employment in semiskilled occupations.   So my question for you, sir, is assuming no exertional limitations, would a person who has, let's be clear about this, a restriction to simple, repetitive tasks be able to perform any or all of the claimant's past work.
>
> A:      Two of the occupations, Your Honor, would be of the opinion could be performed, the industrial cleaner and the office cleaner.
>
> Q:      All right.   Let's further assume that person has an additional limitation to incidental contact with the public.   Would that person with those cumulative limitations be able to perform any of the claimant's past work?
>
> A:      The same occupations, Your Honor, industrial cleaner and office cleaner.

34

> Q:     And under the definition of simple, repetitive tasks, would those jobs involve one or two step instructions?
>
> A:     Yes, sir.  In my opinion, they would.  Both of those occupations.  If I'm understanding Miss Powers' description of her work with bio hazardous material, I would be of the opinion those would be simple, repetitive instructions.

(R. 289-290).  On cross-examination, however, by Powers' counsel, the VE testified that a person with the additional restriction of difficulties in maintaining concentration, persistence or pace at the extreme level as indicated by Dr. Dossman would be unable to complete an eight-hour work day or a five-day week.  (R. 290).  In fact, the VE found that "the ability to work in a competitive environment would be precluded all together."  (R. 290).

Only where the testimony by the VE is based on a correct account of a claimant's qualifications and restrictions, may an ALJ properly rely on the VE's testimony and conclusion.  *See Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).  Unless there is evidence in the record to adequately support the assumptions made by a VE, the opinion expressed by the VE is meaningless.  *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  Here, the ALJ failed to formulate a hypothetical question to the VE that incorporated Powers' difficulties in maintaining concentration, persistence or pace.  Because the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite the Powers' impairments, Powers can perform her past relevant work.  *See Boyd*, 239 F.3d at 708.  As such, the case must be remanded.

### F.     *Failure to Consider Medication Side Effects*

At the time of the administrative hearing, Powers was taking several different medications to attempt to manage her mental illness (bipolar and depression) as well as a sleep aid.  (R. 250).  The record and her testimony vacillated as to whether she experienced side effects from the drugs.

35

(R. 133-135, 147, 150, 153-154, 165, 170, 186-187, 194, 197-198).   Nevertheless, in his decision, the ALJ neither made mention the numerous medications taken by Powers, the side effects of such medications, nor the impact such side effects may have on her RFC.

SSR 96-7p specifically requires consideration of the " type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual' s statements.   *See* 20 C.F.R. § 416.929(c)(3)(iv). Pursuant to SSR 96-8p, the RFC assessment " must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the " limitations or restrictions imposed by the mechanics of treatment; *e.g.*, frequency of treatment, duration, disruption to routine, side effects of medication."

Because Powers is required to take several medications, including anti-depressants and anti-anxiety agents, the ALJ should have taken into consideration possible medication side-effects and any impact such medication might have on Powers'  RFC.   *See Loza*, 219 F. 3d at 397 (history of claimant' s extensive medical treatment with anti-psychotic and other mood altering medications indicated presence of disabling mental illness and possibility of medication side effects that could render claimant disabled or at least contribute to disability).   The ALJ erred by failing to make such an evaluation.   Upon remand, the effect of medication side-effects should be considered in evaluating Powers'  credibility and RFC.

**III.**     *Conclusion*

Accordingly, it is therefore

**ORDERED** that Powers' Motion for Summary Judgment (Docket Entry No. 17) is **GRANTED**. It is further

**ORDERED** that the case is **REVERSED** and **REMANDED** to the Commissioner for a new hearing to properly consider, if necessary by a medical doctor, the severity of Powers' alleged mental impairments, to incorporate Powers' alleged mental functional limitations in a hypothetical question to the VE, to develop clear testimony from a VE regarding jobs, if any, Powers is capable of performing considering all of her limitations, and to consider Powers' medications in her RFC and credibility assessments.

**SIGNED** at Houston, Texas on this the 26th day of March, 2007.

Calvin Botley
United States Magistrate Judge